UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **STEVEN A. LAUTH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CAUSE NO. 1:14-cv-136-WTL-TAB** |
| | ) | |
| **COVANCE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (Dkt. No. 41). This motion is fully briefed,[1] and the Court, being duly advised, **GRANTS** the motion for the reasons forth below.

## I.    STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue

---

[1] The Plaintiff's motion to file a surreply (Dkt. No. 81) is **GRANTED**, and the Clerk is directed to docket the Plaintiff's surreply (Dkt. No 81-1) and accompanying exhibits as of the date of this Entry. The Plaintiff's motion for leave to file a reply in support of that motion (Dkt. No. 84) is **DENIED AS MOOT**.

may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Summary judgment will not be defeated if the claim or defense poses a factual scenario that is plainly contradicted by the summary judgment record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (applying *Scott* principle to plaintiff's conflicting deposition testimony). In addition, the Court does not draw inferences that are "supported only by speculation or conjecture." *Argyopoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citation and internal quotation marks omitted). Finally, genuine disputes over irrelevant or unnecessary facts will not defeat a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Scott*, 550 U.S. at 380.

## II.   <u>BACKGROUND</u>

The facts that follow are viewed in the light most favorable to Plaintiff Steven Lauth.[2] Additional relevant facts are included in the Discussion section below.

In 2006, the Defendant, Covance, Inc.[3] hired Lauth at the age of 54 as a second shift production supervisor in its kit production department. The second shift worked from 2:00 p.m. to 10:00 p.m. From 2006 through mid-year 2012, Lauth reported directly to Donald Snyder, kit production manager, who was 45 years old when Lauth was hired. Snyder transferred out of the

---

[2] Many of the "facts" contained in the Plaintiff's Factual Background and Statement of Material Facts in Dispute section are not supported by the evidence of record. The facts set forth herein are those that are supported by the record and are material.

[3] Although the Plaintiff has sued "Covance, Inc.," it appears that his employer was actually Covance Central Laboratory Services, Inc. ("Covance"). *See* Dkt. No. 42 at 1.

kit production department at the end of June 2012.  From April 2012 through a point in July 2012, Imelda Marsh, the global director of operations who was then 56 years old, supervised Lauth until Christine Walters, who was 42 years old, completed her transition into Snyder's former role in July 2012.

Throughout Lauth's employment, Aaron Ellsworth also worked in the kit production department, but on the first shift from 6:00 a.m. to 2:00 p.m.  He was a systems architect and was responsible for maintaining, growing, and operating the kit production systems software.  He attended management team meetings.  Lauth believed Ellsworth intimidated and bullied Lauth and other employees, and he complained about Ellsworth's harassment starting in 2006.

Throughout his employment, Lauth never received a negative overall evaluation score. He performed well at the production aspects of his position, but his supervisors noted concerns with his communication style.  In Lauth's 2006 year-end performance management review ("PMD"), Lauth received an overall rating of "Meets Expectations."  Snyder stated that "[Lauth]'s hard working, all business approach, was a much needed change for the 2nd shift." Dkt. No. 43-5 at 94.  He also praised Lauth for "help[ing] the entire department add capacity without adding any heads" by "helping [the second shift staff] maximize their output" and for "[his] diligence in getting his staff cross trained as much as possible."  *Id.* at 95.  In the review, Snyder also commented on Lauth's communication with the second shift workforce: "[Lauth] will need to tailor or soften somewhat his approach, to that of his workforce.  Not rolling over, but more adding and using a little more compassion and maybe even incorporating ways to relax the 2nd shift."  *Id.*  He noted that "[Lauth] will need to realize and make any necessary adjustments in his style, in order to match the environment of the 2nd shift work force, without

comprimising [sic] his beliefs and standards." *Id.* at 97.  He also noted that Lauth needed to work on his relationship with the first shift supervisor.  *Id.* at 96.

Lauth again received an overall performance rating of "Meets Expectations" in his 2007 year-end PMD.  Snyder stated that "[Lauth]'s shift is able to accomplish their daily deliverables, with few exceptions."  Dkt. No. 43-5 at 89.  Snyder also recognized Lauth for his "all business approach to the job[, which] reflects on his staff a strong work ethic mentality" and his "continuous diligence[, which] helps his staff in seeing how they should approach their job every day."  *Id.* at 86.  In the category of "Inspires Others," however, Lauth received a rating of "Improvement Needed."  *Id.*  Snyder remarked in the review that "[a] few months ago, there were a few vocal staff members that expressed discontent regarding [Lauth]'s supervision and communication style. . . . [Lauth] will need, and has begun, to tailor or soften somewhat his approach, to that of his workforce."  *Id.*  In the "Confronts Constructively" category, Snyder noted that it was "an issue for [Lauth] at times . . . to be receptive to listening to his staff's suggestions zand [sic] questions."  *Id.* at 88.  He also indicated that "[Lauth] is good about challenging the status quo regarding departmental procedures and standards, but is at times, unreceptive to take help and/or suggestions from others, choosing to do it his way.  This is often not received well with his peers."  *Id.*  Snyder again noted that Lauth "must improve . . . [his] working relationship with his fellow shift supervisors."  *Id.*

Lauth's overall rating in his 2008 year-end PMD was once again "Meets Expectations." Snyder noted that "[Lauth] takes pride in being organized and getting the job done his way." Dkt. No. 43-5 at 78.  He also recognized that "[Lauth]'s shift is able to accomplish their daily deliverables, with little exception[].  Having the least experienced, and at times, least amount in [head count] staff of the 3 shifts, [Lauth]'s ability to get the job done is a thankless one."  *Id.* at

82.  He also commented positively on Lauth's employee management: "[m]oral [sic] no longer seems to be an issue within his shift, regarding [Lauth]'s supervision and communication style," but still rated Lauth as needing improvement in the "Inspires Others" category.  *Id.* at 79.  Snyder noted that he "still sense[d] that there is an issue from time to time with his co-workers."  *Id.*  He reiterated his concerns that Lauth "appears unreceptive to take help and/or suggestions from others" and that Lauth "must improve . . . [his] working relationship with his fellow shift supervisors."  *Id.* at 81.  Snyder again noted that Lauth's unreceptiveness to help and suggestions was "often not received well with his peers" and opined that "[b]ecause of this, to be frank, at times I actually wonder whether or not if [Lauth] is the right fit for our team."  *Id.*  Snyder elaborated on this point in the final comments section of the PMD, stating:

> [Lauth] is a loyal, honest and hard worker, who I enjoy having in the department. However, at times, I have concerns of whether [Lauth] is the right fit for the department, as we continue to grow our business.  Things are not going to get easier, and very good internal communication and trust between shifts will be mandatory. I'm concerned whether this will ever occur for [Lauth] here.  This criticism is more relating to his perceived style, temperament and communication practices.  All areas that are an absolute must in being successful with working with everyone in the department.  There is no room for lone soldiers. . . . Going forward, I need everyone to be on the same page . . . from a process knowledge, leadership, and communication standpoint.  I am not sure at times if this is occurring with [Lauth]. If this does not change, this may impact his rating for next year, or potentially run the risk of me needing to replace him with someone who works better with the others in the room, across all facets.

*Id.* at 82.

In 2009, Lauth received an overall rating of "Meets Expectations."  In 2010, he received an overall rating of "Exceeds Expectations" in his year-end PMD.  Snyder summarized Lauth's accomplishments for the year as follows:

> [Lauth] has had a very good 2010.  His shift's performance in output continue[s] to be an overall asset in leading all shift's [sic]. . . . [Lauth]'s relentless and driven contributions in the areas of departmental output and staff performance, played a huge role in [kit production]'s overall departmental success in 2010.

Dkt. No. 43-2 at 40.  Snyder also praised Lauth for doing "a very good job this year in avoiding

any direct or indirect staff conflict."  *Id.* at 37.  He continued to note, however, that Lauth "is

very strong willed and an independent thinker," which "[a]t times . . . can be confused or

perceived to be detrimental to the cause."  *Id.*  Snyder further stated that it was "[his] intent for

2011 [] for [Lauth] and his [management team] co-workers to channel these attributes in always

making the [t]eam better, which may mean that there is a give from a personal view from time to

time."  *Id.*

In Lauth's 2011 mid-year PMD, Snyder again recognized Lauth for reaching shipping

goals: "[Lauth] has contniued [sic] to do a very good job in having his team reach nearly flawless

shipped on time execution."  Dkt. No. 43-2 at 49.  He also noted that "[Lauth] manages his group

without much need or assistance from myself, or anyone.  This is a strength from the standpoint

of getting the work completed and being the Management presence during his shift hours."  *Id.*

Snyder, however, continued to note communication and team player development areas for

Lauth:

> 5) Communication: During the first half of the year, [Lauth] sent e-mails that I did
> [not] perceive as productive and helpful.  These were in regards to the overly loud
> PA and the sound coming from the new NDHL machine.  Although I know that his
> intent was fine, the manner of [sic] which the emails were written and perceived,
> were [sic] counterproductive.  In early June, [Lauth] challenged a directive that I
> gave and indicated that he was no longer going to complete a duty that he had been
> assigned previously . . . .  We immediately met to review this issue.  He now fully
> understands not to challenge or refuse a task or request that I direct him (or the
> team) to complete in the manner that he did.  He also now understands the best way
> to approach and communicate with me, in the event he wants me to relook at a
> directive or process that I support.
>
> 6) Team player[:] I perceive [Lauth] to be unwilling to reach out and communicate
> proactively to all of his teammates.  Because of that, it puts him on an island all by
> himself too many times.  His "my way", [sic] non-communicative approach is no
> longer acceptable to me.  This needs to change and improve this year.  I want to see
> an obvious change in [Lauth] relating to how he works with all [kit production]

leadership, otherwise, [Lauth] risks being given a Needs Improvement Rating at year end.

I truly enjoy [Lauth], I know that [Lauth] wants to do well within the primary responsibilities in his position, and from the main deliverable within our department, he does . . . [b]ut I want him to be a more integral part of our team. I want him to become a [sic] more knowledgeable ([kit production] processes), a better communicator and a much better teammate within the rest of the entire [kit production] leadershhip [sic] team. He needs to show immediate signs of this improvement. I know [Lauth] can improve on these things above, as they are not that difficult and much to complete.

*Id.* at 50.

During Snyder's meeting with Lauth regarding the 2011 mid-year PMD, Snyder asked Lauth when he was going to retire. Shortly after receiving the 2011 mid-year review, Lauth responded on August 3, 2011, by email to Snyder. Lauth acknowledged that he "could have handled a few e-mails in a better way," and characterized them as "an incident rather than a pattern." Dkt. No. 43-6 at 111. He also stated that "[m]y main concern is with a general statement surrounding my communication and contributions to the team." *Id.* He stated that he had "many thoughtful conversations, problem-solving sessions with [his] team and individuals daily, and with the other supervisors that [Snyder was] not necessarily a part of, and which [Lauth] consider[ed] critical to communicating and being a team player." *Id.*

On August 28, 2011, Lauth submitted a complaint through Covance's company-wide employee AlertLine. He complained that Ellsworth had been violating Covance's Code of Conduct since 2006. He stated that "[t]he basis of [his] complaint, while not specific as it relates to 'unlawful harassment, including sexual harassment and harassment because of race, color, religion, national origin, gender, age, disability, veteran's status or any other characteristic protected by law,' does fall into a behavior category that is contrary to Covance Code of Conduct." Dkt. No. 43-7 at 79. He "believe[d] [his] complaint report[ed] behavior that could be

labeled 'bullying' and 'intimidation' contrary to Covance's Principle of 'Respect for the individual.'" *Id.* at 80.  He also explained the following:

> Due to the statements made by my manager in my review, I responded in an email specifically to my manager's comments in a much more timid manner where I normally would have felt comfortable challenging some of his assertions, because I felt that I was being threatened – not truly because of my work performance being inadequate, but more due to the environment that exists in our department as a result of [Ellsworth]'s continued exhibits of control, intimidation and bullying.   It was very clear that [Snyder]'s comments of being a team player were meant to communicate that I needed to 'get along better' with [Ellsworth]. . . . I find myself anxious on Sundays about returning to work on Monday knowing I have the possibility of interacting with [Ellsworth] and [being] subjected to his incessant questioning of my ability to do my job well.  That anxiousness has now flourished into a fear that I may lose my job.   Although this abusive environment that [Ellsworth] has created exists and has been brought to [Snyder]'s attention on many occasions by myself and others, he has allowed the situation to continue.

*Id.* at 79.  He further requested that Covance "have [Ellsworth] removed from the [kit production] area and not be allowed to have personal contact with [kit production] personnel." *Id.* at 80.

Covance's legal department referred Lauth's AlertLine complaint to Gary Grubb (born 1967), a human resources generalist at the Indianapolis facility, for investigation.  Grubb finished his investigation in or around late November or early December 2011.  Grubb concluded that Snyder had not mistreated Lauth, but that Ellsworth had behaved inappropriately several times, raising his voice or making inappropriate comments.  He recommended to Snyder that Ellsworth be placed on a Performance Improvement Plan ("PIP").  He also identified areas in which Lauth could improve his workplace communications.

On December 2, 2011, Grubb met with Lauth to communicate the conclusions of his investigation and let him know that Ellsworth would be counseled.  Lauth thought that discipline was insufficient.  On December 5, 2011, Lauth sent an email to Grubb, reiterating that "this solution [to his complaint against Ellsworth] is totally unacceptable." *Id.* at 82.  He stated that

"[t]he depth of the investigation apparently did not go far enough, and the damage to so many people and Covance has not been fully examined." *Id.*

On January 10, 2012, Covance posted a follow-up comment in Lauth's AlertLine complaint, explaining that it had completed its investigation into Lauth's complaint and "discovered certain behaviors by [] Ellsworth that are inconsistent with Covance's expectations" and explained further that "corrective actions have been taken including, coaching and monitoring workplace communications." *Id.* at 81.  Covance also explained that it did not substantiate Lauth's allegations of unfair treatment by Snyder, but that "[i]n reviewing email messages and other documents produced by [] Lauth to substantiate his allegations, [it] identified areas of improvement for [] Lauth's workplace communications and [] Lauth has been counseled accordingly." *Id.*

On January 11, 2012, Snyder placed Ellsworth on a 90-day PIP, which stated that Ellsworth was "[m]aking inappropriate comments about employees to their peers, being condescending and rude towards employees" and that those "actions have been viewed as intimidating and bullying by those impacted and have created a hostile work environment."  Dkt. No. 43-2 at 51-52.  Ellsworth satisfactorily completed his PIP on May 18, 2012.

On January 25, 2012, Lauth filed with the EEOC a charge of discrimination.  He alleged that Covance discriminated against him on the basis of his age and retaliated against him for making internal complaints about Ellsworth.

That same day, Snyder met with Lauth and, among other things, discussed the outcome of the AlertLine complaint.  He noted that Grubb had already spoken with Lauth and that Lauth had received the investigation response from Covance as well, but he wanted to reiterate what Grubb had told Lauth: that they had "counseling going" with Ellsworth, had given him action

items to work on, and were monitoring him.  Dkt. No. 46, Ex. A-4.[4]  Snyder also explained that some of the same things that they had discussed regarding Lauth's communication at his mid-year review still applied to him.  Specifically, Snyder told Lauth that he, like Ellsworth, was expected to be cordial to everyone, including Ellsworth.  A few hours later, Lauth responded to Snyder by email.  He mentioned that Snyder had "brought up the alert line complaint as concluded, then mentioned the communication issues from your review about me at mid-year."  Dkt. No. 43-7at 84.  He disputed that he had communication issues, stating, in part, as follows:

> You made a comparison in our meeting today with Aaron Ellsworth, in that we need to be cordial to everyone and to one another.  That is an incorrect statement you made that I am not being cordial with others; I am always cordial to everyone. It is only [Ellsworth] that I need to be more cordial [sic], but there is a reason why I have not been cordial, and that is specifically pointed out and stated in the alert line complaint.  You made a statement that your expectation [sic] were that I be more cordial with everyone in the room.  I am not sure where you came up with that remark, or why you would make such a statement, but that remark is wrong and untrue.

*Id.*  Snyder responded by email the following morning, indicating that he had not said that the alert line process was concluded, reiterated that Ellsworth was being counseled, and repeated that he expected Lauth, and the entire team, to act "in the most professional, cordial and cooperative manner." *Id.* at 83.  For Lauth, he specifically pointed out he needed to behave in such a manner toward Ellsworth and to "immediately follow these expectations going forward."  *Id.*  He advised that "if I am made aware of any further non-professional, non-cordial, non-cooperative interactions of your doing in the future with [Ellsworth], you will be subject to Progressive Corrective Action."  *Id.*

---

[4]  Lauth made audio recordings of several meetings starting in December 2011.  Dkt. No. 43-6 at 44; Dkt. No. 46.

In or around February 2012, Snyder gave Lauth his 2011 year-end PMD.  In that review,

Snyder ranked Lauth as "Meets Expectations."  Snyder recognized that "[Lauth] does a good job

monitoring consistant [sic] to increasing performance by his staff, every day."  Dkt. No. 43-2 at

73.  He again noted that "[s]tatistically, [Lauth]'s shift often leads in many categories, which

again is no small task, considering that his shift is not fully staffed, and does not have the most

headcount."  *Id.* at 76.  Snyder also pointed out that "[Lauth] has avoided any conflicts with floor

staff in 2011," but he continued to note other communication problems.  *Id.* at 75.  Specifically,

Snyder noted the following:

> I unfortunately still perceive [Lauth] to be inconsistently willing to reach out and
> communicate proactively to all of his teammates.  Because of that, it puts him on
> an island all by himself too many times.  His "my way" [] non-communicative
> approach is no longer acceptable to me.  Because he hasn't changed my assessment
> of this through his actions, I have needed to schedule a mandatory reoccuring [sic]
> [t]eam meeting with him and his peers.
>
> I expect to see an obvious change in [Lauth] relating to how he works with and
> communicates with all [kit production] leadership.
>
> I truly enjoy [Lauth], and believe that [Lauth] wants to and can do well within the
> primary responsibilities in his position, and from the main deliverable within our
> department, he does . . . .  But I also believe from his communications, [sic] that he
> thinks his job is done at that point.  That should no longer be his interpretation.

*Id.* at 78.  Lauth responded on February 27, 2012, stating:  "There are a few good observations in

this review, yet there are far more inaccuracies.  I must refrain from commenting at this time.  A

written response is saved and will be sent at a later date."  *Id.* at 79.

On April 30, 2012, the EEOC issued Lauth a Dismissal and Notice of Rights in

connection with his January 25, 2012, charge of discrimination.  His deadline was July 30, 2012,

to file suit with respect to the issues of which he complained in his charge.  Lauth did not sue

Covance following his first charge of discrimination.

11

In June 2012, Snyder transferred out of the kit production department to a new position

within Covance.  Between April and July 2012, Marsh also supervised the kit production

department until Walters fully transitioned into the kit production manager role in July 2012.

On July 10, 2012, Marsh sent an email regarding Lauth to Grubb.  She noted that Lauth

had a conversation with Walters in which "he was argumentative and insubordinate in his

approach with [Walters]."  Dkt. No. 63-10 at 1.  Marsh explained that she planned to meet with

Lauth on July 11, 2012, to give him a PIP and corrective action, but was seeking approval to

terminate Lauth.

Instead of terminating Lauth or giving him a PIP, Marsh issued Lauth a written warning

"due to repeated inappropriate and unprofessional communication."  Dkt. No. 63-7.  In the

warning, she cited the following as the basis for the warning:

> This written reprimand is being given due to:
>
> - Inability to establish stable, manageable and positive working relationships with peers as described in the Covance Core and Leadership Competencies.
> - Inability to receive constructive feedback as was noted by your previous manager and by me.
> - Your approach with peers, both orally and verbally [sic] when discussing people and processes within [kit production].
>
> You are receiving this written reprimand for your continued confrontational behavior and inappropriate written communication exhibited in the emails that I have been copied on since April of 2012.

*Id.*  Lauth signed the written warning at a meeting with Marsh on July 20, 2012.  He also added

two sentences to the document: "I acknowledge receipt of this document, but I do not agree with

its' [sic] content" and "This is a disciplinary document."  *Id.*  In the meeting, which Lauth

recorded, he stated that Marsh had mentioned that Covance's attorney was going to sign off on

the document, but he noticed that there was no signature on it.  He also asked if it was standard

procedure for the attorneys to review the document.  In response, Marsh said that, given Lauth's

12

recent EEOC charge, the situation was "a little out of the norm," and it was human resources

policy to review the document with the attorney.  Lauth asked if he could prepare a written

response to the document.  Marsh responded as follows:

> If we're going to go down this road every time we talk, this is not going to work
> for me. . . . If I have to feel like I'm on trial with you every time I have a
> conversation with you, if I feel like you're putting together a case, this is not the
> right place for you.  I'm telling you, you are not going to be successful on my team.
> So, that's what I asked you about the last time, [inaudible] you really need to think
> about your future here, and if you can't change this, then this is not the right job for
> you.

Dkt. No. 46, Ex. A-6.

Shortly after Marsh delivered the written warning, Walters became the full-time kit

production manager.  Walters met with Lauth on August 2, 2012.  Lauth audio-recorded the

meeting.  Walters explained that Snyder completed both a PMD and PIP for Lauth and that he

had been delivering to employees the review documents that he created.  She explained that

Snyder would read what he wrote in the PMD, leave, and then Walters would deliver the PIP.

Lauth explained that he had "no respect for [Snyder] whatsoever," had "no desire to have another

review with him," and preferred that Walters present the documents to him without Snyder

present.  Dkt. No. 46, Ex. A-7.

On August 8, 2012, Lauth met with Walters to receive his 2012 mid-year PMD and PIP

documents.  Both documents were issued by Walters, but were initially drafted by Snyder.  The

PMD identified four "Development areas" that indicated that Lauth was "tracking towards a

'Needs Improvement' year end rating."[5]  Dkt. No. 63-28 at 10.  It stated: "[Lauth] is perceived

---

[5]  Lauth claims that Covance asserts that Lauth's "PIP was instituted as a result of an
'Improvement Needed' rating on Lauth's [2012] midyear PMD" and that the rating was devised
"for the purpose of creating a facial justification for Lauth's PIP."  Dkt. No. 67 at 24 & 25,
respectively.  He claims that Walters altered the document to insert the rating on August 9, 2012,
"the day after Lauth was shown the PMD by Walters and placed on his PIP," to construct the

by all the [kit production] Leadership team and many outside the [kit production] Leadership

team to be unwilling to reach out, help or communicate positively and proactively to all of his

teammates." *Id.* It also noted "[Lauth] typically did not bring any updates, contribution, or

questions to the bi-weekly [kit production] Leadership meetings" and that he "refused to change

his communication practices, despite being informed via PMD meetings numerous times." *Id.*

Finally, Snyder indicated that "[Lauth] has informed me that he does not plan on providing any

project idea and solution, or to work on any process improvement project, despite this task being

noted on his objectives." *Id.*

The PIP was issued "due to on-going concerns regarding [Lauth's] performance and/or

behavior." Dkt. No. 63-11 at 1. It contained a "History of Performance/Behavior Discussions"

section, which omitted reference to the July 20, 2012, written warning, but identified specific

instances of prior behavioral issues that had occurred since his 2011 review. *See id.* at 1-2. It

also described the business impact of Lauth's behavior as follows:

- Continued inability to communicate and work with colleagues in a
  cooperative and constructive manner deters from the entire team working

---

above pretextual narrative. Dkt. No. 67 at 25. Lauth contends that "[i]t is reasonable to infer
that Covance departed from its ordinary practice of not giving midyear ratings by giving Lauth
an "Improvement Needed" rating for the purpose of creating a facial justification for Lauth's
PIP." *Id.*

       Covance, however, does not appear to advance that theory. Rather, the PIP itself
indicates that the reason Lauth was being placed on it was "due to ongoing concerns regarding
[his] performance and/or behavior," not because he received an "Improvement Needed" ranking
on his 2012 midyear PMD. Dkt. No. 63-11 at 1. Lauth's argument is a red herring intended to
create the illusion of an irregularity in Covance's standard PMD-issuance process. Even if
Walters had inserted the "Improvement Needed" text into the rating section of the PMD on
August 9, 2012, she would have simply been reiterating what the content of the PMD already
stated, which was that Lauth "[was] tracking towards a "Needs Improvement" year end rating."
Dkt. No. 63-28 at 10. The PMD form itself explained that the rating section in a midyear PMD
was used "to identify an employee *who might be tracking toward* an 'Improvement Needed'
rating. This is *not a final rating* for the employee. For all other employees, please select 'Not
Applicable.'" Dkt. No. 63-28 at 9 (emphasis added).

14

with the same common goal and approach.  This behavior is detrimental to
the team's success.

- Recent incident of improper communication towards an employee of a
vendor damaged relationship with vendor.
- Communicating to co-workers in a judgmental rather than a constructive
manner and refusing to participate in decision making conversations
alienates [Lauth] from the rest of the [kit production] Leadership Team.

These listed behaviors are not conducive to a strong team environment and
may have a significant adverse impact to the overall success of the Global Kit
Production Operation.

*Id.* at 2.  In addition, the PIP outlined four performance goal areas: "Leads by Example," Works

Well with Others," "Confronts Constructively," and "Inspires Others."  *Id.* at 3.  It also provided

three steps necessary to achieve these goals:

1)  Provide appropriate and timely communications to all peers relating to any
positive or negative performance observations.
2)  Continue to participate in department leadership meetings, with the purpose of
strengthening all current working relationships, in an effort to build trust and to
demonstrate genuine value of everyone's input.
3) Better use of communication in corresponding to ongoing initiatives and projects
and work related concerns, with a more proactive, outreaching approach.  Current
communication style is perceived as rude and inflexible.

*Id.*  At the meeting, when Walters asked Lauth what he thought about the PMD, he

responded: "Well, to me, it's all retaliatory.  There's no point in making

recommendations when there are two people [Snyder and Ellsworth] who run the

department, so, you know, I learned this a long time ago."  Dkt. No. 46, Ex. A-8.  He

further commented as follows:

You could have a great idea, but before, it didn't matter how great the idea was.  If
they didn't like it, they didn't like it.  There was no input, so this PIP, to me, is
frivolous, it's a mistake. . . . Since I've been here, I've tried to do something and so
basically it's turned around and . . . against me and it's being made to look, uh, to
make me look bad. . . . The way the operation was going, uh, basically from the
time I got here, was wrong . . . so I tried to correct a number of things.

*Id.*

Walters had a meeting with Lauth on August 21, 2012, to discuss his progress on the PIP. Lauth met its requirements the first two weeks it was in place. Lauth was then on vacation from September 1 through September 17, 2012. Lauth filed his second EEOC charge on September 17, 2012. *See* Dkt. No. 1-4 at 1.

On September 12, 2012, while Lauth was on vacation, Ellsworth and Roger Carter, a first-shift kit production employee, had an argument on the kit production floor, during which both raised their voices. Following the incident, Ellsworth approached Carter to apologize for his role in the disagreement and to discuss how the conversation could have gone better. Ellsworth also reported the incident to Walters. Walters reported the situation to human resources and spoke with Ellsworth and Carter's first shift supervisor regarding the incident.

Lauth returned to work on September 18, 2012. That day, he learned of the incident between Ellsworth and Carter. Lauth and Walters also had a meeting that day regarding Lauth's progress on the PIP. At that meeting, Lauth mentioned to Walters the incident between Ellsworth and Carter. Walters informed Lauth that she was already aware of the incident, had reported it to human resources, and had already dealt with it. Despite this response, Lauth investigated the incident himself, calling Carter's daughter, who was not involved, and having Carter call him to discuss it. On September 21, 2012, Lauth sent an email to Grubb reporting the incident between Ellsworth and Carter, even though he knew that Walters had already reported the incident to human resources. He stated that "I am bringing this to your attention, to go on record, that [Ellsworth]'s misconduct, behavior/actions were unacceptable. Due to my long standing [sic] attempts to correct this behavior on behalf of our employees[,] I am obligated as a manager and as a human being, to help those I work with, put a stop to such inexcusable ongoing behavior." Dkt. No. 63-14. He also remarked that "[u]nder the 'New' policy, 'Covance CLS

Indianapolis, Policy, Corrective Performance Management, ER-1', investigation and immediate corrective action, and in this additional case, to add to a long history of harassment/misconduct, immediate termination needs to be seriously addressed." *Id.* Grubb responded on September 24, 2012, indicating that he was already aware of the situation and that it had been handled by Walters and the first-shift manager during the week it occurred.

On September 25, 2012, Ellsworth sent an email to Walters letting her know that he had heard that Lauth had asked Carter for details about the September 12, 2012, incident "because [Lauth] wanted to take care of the problem." Dkt. No. 63-13. Ellsworth indicated that Lauth's behavior was "starting to feel a lot like harassment as this is the second time this year that [] Lauth has tried to collect information about a perceived issue with me and another employee." *Id.* Ellsworth was not aware that Lauth had filed any EEOC charges or made the AlertLine complaint until after Lauth filed this lawsuit.

On October 2, 2012, Walters held another PIP progress meeting with Lauth, which Lauth audio-recorded. *See* Dkt. No. 46, Ex. A-9. During the meeting, she discussed with Lauth his investigation into the incident between Ellsworth and Carter. Walters indicated that she had previously told Lauth that she took care of the issue. She said that, when she said that she had handled the issue, she would have liked Lauth to have responded by trusting her handling of the situation. That is, she would have liked that he had not investigated the incident himself. Lauth stated that he has been trying to get Ellsworth's behavior corrected for the past six years and that year after year, the problem was not remedied. He indicated that there were two standards, one for Ellsworth and Snyder and another for everyone else. He said that he had to record that the issue happened "for [his] own benefit and [his] own records." Dkt. No. 46, Ex. A-9. Walters asked Lauth if he intended to document any situation employees encountered or just those

involving Ellsworth.  He responded that this situation was not being corrected "in a firm enough way to protect employees" and that "if it's anybody else, I'm not doing this."  *Id.*  He also mentioned that he needed to "go on record to make sure that the past is kept alive until the problem is corrected one way or another."  *Id.*  Walters indicated that she believed Lauth's behavior went against the PIP.  Lauth disagreed.  He said that he had to report the incident; that his own behavior "has nothing to do with the PIP"; "[w]hat [he] did was not wrong"; and that he was "handling [himself] in an appropriate and professional manner."  *Id.*  He also reiterated that, the PIP was inappropriate in the first place because it did not go back to find "the root cause."  He stated that if the root cause had been investigated, there would not be a PIP against him, and that correcting him was "the wrong approach."  *Id.*

In the days following that meeting, Walters received additional complaints against Lauth.  On October 8, 2012, Kathleen Kiemeyer, a second-shift employee, approached Walters to complain about Lauth's treatment of her.  Dkt. No. 63-41 at 3.  Kiemeyer also met with Heidi Sturgeon (born 1966), a human resources employee, the following day.  Kiemeyer complained that she was being harassed by Lauth and was afraid of losing her job.  Dkt. No. 43-12 at 27 & 29 respectively.  She complained that Lauth was unapproachable and intimidating.  He would stand for minutes at a time looking at her with his arms folded.  She said he watched everyone, and the environment was tense.

On October 9, 2012, Lisa Britt, the first shift kit production supervisor, sent an email to Walters reporting that Rhonda Taylor, a new kit production employee, was having issues with Lauth.  Britt said that she ran into Taylor and asked her how it was going and that Taylor almost started to cry.  Britt reported that Taylor said that Lauth was not a nice person and that she

wanted to transfer.  Like Kiemeyer, she felt Lauth was unapproachable and intimidating and reported that he stared at her with his hands crossed.

On October 12, 2012, Cassandra Wilson, another second shift employee, approached Walters to make a complaint.  She complained that Lauth had written her up for an error that she made while she was in her third day of training.  She felt that it was unfair that Lauth disciplined her.  She felt he was targeting her for discipline because he had already accused her of a bullying incident in which she had not been involved.  Like Kiemeyer and Taylor, she also felt that Lauth was intimidating and said that it made her uncomfortable when he would stand and watch her work.  She refused to go to human resources with her complaints because she did not feel comfortable doing that.

Shortly after Wilson's complaint, Tammy Wright, a second-shift kit production employee, spoke to Britt about a concern with respect to training.  Dkt. No. 43-17 at 9.  Britt informed Walters.  *Id.* at 10.  On October 17, 2012, Walters met with Wright to discuss the issue. Wright did not feel that she was receiving the training that she would have liked, and she was interested in moving to another department because of pay.

On October 18, 2012, Walters and Sturgeon met with Lauth to discuss the recent employee complaints they had received.  Lauth was dissatisfied with how the complaints were presented to him because he did not get to investigate the complaints himself.  Lauth acknowledged he could have handled some of the situations differently, that he had perhaps been stern, but ultimately felt comfortable with his management style and did not plan to change. Walters did not perceive Lauth to take any ownership of the complaints.  At the conclusion of the meeting, Lauth asked Walters to interview other individuals on his shift to see if they agreed with the allegations regarding his behavior.

19

On October 22 and 23, 2012, Walters interviewed an additional six second-shift kit production employees regarding their experience with and perceptions of Lauth.  Of the six employees, five reported similar types of behavior by Lauth as that reported by Kiemeyer, Wright, Wilson, and Taylor.  The employees reported that Lauth was unprofessional, condescending, non-communicative, and would not train them in new roles.  The sixth employee reported that she did not have any issues with Lauth, but understood other employees had difficult relationships with him.

After her investigation, Walters met with Sturgeon to discuss her findings.  Walters recommended Covance terminate Lauth's employment for continued performance deficiencies in violation of the on-going obligations of his PIP.  Sturgeon and Covance's legal department concurred with Walters' recommendation.  Walters and Sturgeon met with Lauth on October 25, 2012, and terminated his employment, effective immediately.

### III.   DISCUSSION

Lauth brings two claims in his complaint: 1) a discrimination claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; and 2) a retaliation claim pursuant to the ADEA.  Covance moves for summary judgment on both counts.  Its arguments are addressed, in turn, below.

### A.   Evidentiary Matters

Lauth raises several evidentiary issues, which the Court resolves as follows:

#### 1.   Adverse Inferences

Lauth argues that Covance destroyed relevant documents and requests that the Court impose specific adverse inferences relating to Covance's position as a result.  To obtain an adverse inference regarding evidence not produced, the party claiming spoliation of evidence

must show that the other party "intentionally destroyed the documents in bad faith." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). That is, the party destroyed the evidence "for the purpose of hiding adverse information." *Id.* (internal quotations omitted). "Thus, the crucial element is not that evidence was destroyed but rather the reason for the destruction." *Id.* (citation omitted).

Lauth contends that "the Court should disregard March's [sic] assertions and impose an adverse inference that March's [sic] claims are unsupported" because, in 2014, after she was no longer employed by Covance, Imelda Marsh threw away her personal file pertaining to Lauth. Dkt. No. 67 at 22. He further argues that "the Court should impose an adverse inference that Marsh's characterization of Lauth is not credible" and "should disregard Marsh's conclusions regarding [his] demeanor." *Id.* at 18. Lauth does not contend that the destroyed documents contained information adverse to Covance's position or that the evidence would have been favorable to him had it been produced. Nor does he point to any evidence supporting his position that Marsh's characterization of him is not credible. *See Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001) (speculation not enough to show documents destroyed in order to hide discriminatory information). Therefore, Lauth has not met his burden of showing that Covance intentionally destroyed the documents in bad faith. Marsh's destruction of her personal file on Lauth, therefore, does not warrant the imposition of an adverse inference and does not raise any issue of material fact with respect to Lauth's claims.

Lauth further argues that Covance "wrongfully did not preserve" Kiemeyer's October 4, 2012, email complaint regarding Lauth. Dkt. No. 67 at 9. Although Kiemeyer testified at her deposition that she sent an email to Walters seeking to transfer from the department, Lauth asserts that the Court should impose an adverse inference that Kiemeyer never sent an e-mail

complaining about Lauth "and that Kiemeyer was instead solicited or pressed by Covance to

complain about Lauth because Covance knew Kiemeyer did not like Lauth and would provide

evidence against Lauth to support Covance's stated desire to terminate Lauth's employment."

*Id.* at 27 n.12.  Lauth's argument is unavailing.  Lauth has not provided any reason to believe that

Covance destroyed the email for the purpose of hiding adverse information.  Again, Lauth did

not produce evidence that the destroyed email contained information adverse to Covance's

position or information that would have been favorable to him had it been produced.  Moreover,

Covance need not rely on the email or its contents:  Kiemeyer was deposed and testified about

her complaints against Lauth and her conversations with Walters and Sturgeon concerning those

complaints.  Accordingly, Lauth is not entitled to an adverse inference with respect to the

contents of Kiemeyer's email.

### 2.     *Authenticity*

Lauth also challenges the authenticity of several documents and speculates that Walters

altered documents.  Although Lauth cites fairly extensively from his 2010 year-end PMD, he

disputes the excerpt cited by Covance and objects to the document's authenticity because it lists

Walters as its author on the first page of the form, and she was not his supervisor at that time.

The document's audit history section, however, shows that the document was created by Snyder

on January 4, 2011.  Dkt. No. 43-2 at 40.  Lauth's 2011 mid-year review similarly lists Walters

as the author when she was not his supervisor, and it also indicates that Snyder created the

document on July 13, 2011.  Dkt. 43-2 at 41 and 50, respectively.  Both documents also contain a

"last updated by" section that contains no author name, but is date-stamped "08/08/2012

8:42:08AM."  Dkt. No. 43-2 at 40 and 50, respectively.  Lauth does not make any objection to

the 2011 mid-year review's authenticity.  With respect to the 2010 year-end document, Lauth

22

contends that the inclusion of Walters' name on the document "indicates changes were made as late as August 8, 2012." Dkt. No. 67 at 15 n.5. Apart from the document itself, Lauth does not provide any evidence supporting his contention that the document is inauthentic or was otherwise altered.

Federal Rule of Evidence 901(a) (the Court notes that Lauth improperly made his objection under Indiana Rule of Evidence 901) provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."

Prior to Lauth raising his objection, Covance explained in its brief in support of its motion for summary judgment that a "manager's name is electronically affixed to [employee] evaluation[s] through PeopleSoft." Dkt. No. 42 at 5 n.4. When a manager changes, Covance enters the new manager's name into PeopleSoft, and that change in the program "often causes the 'Manager' line from the original electronically maintained [evaluation] to update to the new manager's name." *Id.* "If the manager's name has changed, the original author of the evaluation may be found by reviewing the 'created by' line at the end of an evaluation." *Id.* In her declaration submitted contemporaneously with Covance's motion, Walters stated: "I did not make any changes or edits to Lauth's performance management documents ('PMDs') delivered to Lauth prior to July 2012." Dkt. No. 43-3 ¶ 4. Snyder similarly declared that he "prepared and delivered Lauth's 2010 year-end PMD as part of the regular practice of Covance's business activity" and stated that "[a] true and accurate copy of Lauth's 2010 year-end PMD, which I prepared and delivered to Lauth in or around January or February 2011, is attached as [Dkt. No. 43-2 at 30-40]." Dkt. No. 43-2 at 3 ¶ 10. For purposes of this Entry, this evidence serves to

support a finding that the 2010 year-end PMD is what Covance purports it to be.  Accordingly, Lauth's objection is overruled.

Lauth also objects to the authenticity of Covance's 2011 year-end PMD document "because it appears to be a self-evaluation rather than a manager's evaluation."  Dkt. No. 67 at 16 n.6.  The document says "Self-Evaluation" on its first page, but lists its author as Snyder.  *See* Dkt. No. 43-2 at 69.  The last page contains comments inserted by Lauth on February 27, 2012, where he indicates that "[t]here are a few good observations in this review, yet there are far more inaccuracies" and that he will send a written response at a later date.  Dkt. No. 43-2 at 79.  These comments suggest that Lauth did not create the document himself despite its "self evaluation" language on the first page.  Lauth contested the accuracy of the contents of the document on February 27, 2012, when he first received it.  Apart from the document itself, Lauth again does not provide any evidence supporting his contention that the document is inauthentic.  Covance, on the other hand, submitted a declaration by Snyder, in which he avers: "I prepared and delivered Lauth's 2011 year-end PMD as part of the regular practice of Covance's business activity" and "[a] true and accurate copy of Lauth's 2011 year-end PMD, which I prepared and delivered to Lauth in or around February 2011, is attached as [Dkt. No. 43-2 at 69-79]."  Dkt. No. 43-2 at 5 ¶ 21.  For purposes of this Entry, this evidence serves to support a finding that the 2011 year-end PMD is what Covance purports it to be.  Accordingly, Lauth's objection to the 2011 year-end PMD is overruled.

Furthermore, Lauth asserts that Walters altered Lauth's 2012 mid-year PMD after she gave it to him.  Dkt. No. 67 at 25.  He, however, does not seek an adverse inference or challenge the admissibility of the document.  Instead, he explains that viewing the native format of this document "may show what information was altered by Walters after she met with Lauth."  *Id.*

n.11.  Lauth stated that he asked for the documents in native format in his discovery requests but did not receive them.  *Id.*

To aid in seeking the native-format documents, Lauth's counsel could have sought assistance from the Court, either informally by contacting the Magistrate Judge assigned to the case or formally by filing a motion to compel.  Lauth also could have used Federal Rule of Civil Procedure 56(d) if he believed he needed the documents to respond to the motion for summary judgment and had a good reason for not obtaining the documents sooner.  Lauth did not do any of these things.  Instead, he impermissibly brings a potential discovery dispute into the summary judgment motion context.  *Malik v. Falcon Holdings, LLC*, 675 F.3d 646, 649 (7th Cir. 2012) ("[I]f defendants thought that plaintiffs had failed to perform their obligations under the rules, they should have asked the district judge for a sanction before discovery closed rather than waiting (as they did) until their motion for summary judgment.").  Therefore, Lauth's complaint that he did not receive all of the discovery he requested is not well taken.

### 3.    *Hearsay*

Lauth also objects to the admissibility of statements made by employees to Covance, as testified to or documented by Walters, Marsh, or Ellsworth.[6]  *See, e.g.*, Dkt. No. 67 at 16-17.  Lauth alleges that such statements are inadmissible hearsay that should be stricken.

"[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."  *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also*

---

[6]  Lauth raises additional hearsay objections regarding complaints by Amit Patel to Marsh, statements made by Carter to Ellsworth, statements made by Britt and Patel to Walters regarding Kiemeyer, statements made by Maritza Rosales to Walters regarding training, and statements made by Wilson and Walters related to Wilson's training.  Dkt. No. 67 at 16-17, 19.  Because the Court did not consider these statements in its analysis in this Entry, it need not consider Lauth's objections to them.

*Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.") (citing *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003)). Covance contends, however, that the statements are not hearsay because they are not offered to prove the truth of the matter asserted. Rather, they are offered "for the affect [sic] the statements had on Covance;" that is, "to prove Covance was motivated by these statements and not [Lauth's] Charges [of discrimination] in terminating Lauth's employment." Dkt. No. 75 at 19. To show the effect that the statements had on Covance, that it relied on them in deciding to terminate Lauth, is a non-hearsay purpose. *See Boutros v. Avis Rent A Car Sys., LLC*, 802 F.3d 918, 924 (7th Cir. 2015) (out-of-court statements were admissible because they were "presented not for their truth but as evidence of [the employer]'s [non-pretextual] reasons for suspending and then firing [the plaintiff]"); *see also Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 796 (7th Cir. 2015) (holding that a negative reference told to a decisionmaker by an anonymous staff member of the plaintiff's former employer was not inadmissible hearsay because it had been "considered not for its truth, but to show its effect on the state of mind of the hearer") (citing *United States v. Leonard-Allen*, 739 F.3d 948, 954 (7th Cir. 2013) ("A witness's statement is not hearsay if the witness is reporting what he heard someone else tell him for the purpose of explaining what the *witness* was thinking, at the time or what motivated him to do something.") (emphasis in original); *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay.")). Accordingly, the statements are admissible for this purpose. Thus, Lauth's objections to these statements are overruled.

### 4.       Material Factual Disputes

Lauth also contends that some complaints made about Lauth by employees were untrue or that the behaviors about which the employees complained were justified.  For example, Lauth disputes the veracity of the complaints that Walters said Wright made.  Although Lauth does not dispute a single fact related to Wright's complaint in his Statements of Material Facts in Dispute, in his argument section, he requests that the Court reject Wright's complaint as a legitimate basis for Lauth's termination "because Wright has expressly rejected virtually all of Walters' representations of Wright's alleged complaint" and that "Walters also fabricated most of [Wright's] alleged complaints about Lauth."  Dkt. No. 67 at 31 & 32 respectively.  In her deposition testimony, Wright acknowledged that she remembered only "bits and pieces" of her conversation with Walters.  See Dkt. No. 63-44 at 3, 11.  She also testified that she had memory issues that "started getting bad" in 2009 and would have been affecting her in 2012 due to high ammonia levels in her body because of a liver condition she had at that time.  Id. at 8.  Wright did not say at her deposition that Walters fabricated the complaints Walters documented in her meeting notes.  Rather, in response to the question, "Do you have any reason to doubt what [Walters] testified to [regarding her documentation of her meeting with Wright]?," Wright responded, "No."  See Dkt. No. 43-17 at 11.  Moreover, Lauth does not dispute that others, including Kiemeyer, Taylor, and Wilson complained about his intimidating and unapproachable demeanor.

Lauth contends, however, that "Kiemeyer was a difficult employee who did not like to be held accountable and managed."  Dkt. No. 67 at 28.  He speculates, without supporting evidence that Walters sought out Kiemeyer to get a complaint from her that would provide a justification for Lauth's termination because she knew she did not like Lauth.  He argues that he has raised

27

genuine issues of material fact about Kiemeyer's complaints.  The Court disagrees.  Instead of

raising a material factual dispute, Lauth raises an attack to Kiemeyer's credibility.  However, "a

party cannot defeat summary judgment with resort to attacks on credibility alone."  *Morgan v.

SVT, LLC*, 724 F.3d 990, 999 (7th Cir. 2013); *see also Springer v. Durflinger*, 518 F.3d 479, 484

(7th Cir. 2008) (cited in *Morgan*).  The Court notes that evaluations of witness credibility are

inappropriate at the summary judgment stage.  *Springer*, 518 F.3d at 484 (citing *Washington v.

Haupert*, 481 F.3d 543, 550 (7th Cir. 2007)).  Nonetheless, absent evidence that shows a

witness's testimony is false, speculation that the witness is lying cannot be used to defeat

summary judgment.  *Argyropoulos*, 539 F.3d at 736 ("Lacking such evidence, [plaintiff]'s

argument rests on speculation that the City's employees lied to conceal their true motives.  Such

speculation will not withstand summary judgment.").  Such speculation, not a material factual

dispute, is what Lauth advances when he suggests that "Kiemeyer was not a credible

complainer."  Dkt. No. 67 at 28.[7]

## B.    Age Discrimination

Lauth alleges that he was disciplined and terminated because of his age in violation of the

ADEA.[8]  Under the ADEA, it is unlawful for an employer, among other things, "to discharge any

---

[7] Lauth also claims there are disputes of material fact with respect to a number of statements made by Covance's employees on the basis that the statements are "subjective conclusions" of the speakers.  *See, e.g.*, Dkt. No. 67 at 17-19.  Such contentions, however, do not create material factual disputes.

[8] Citing to Lauth's deposition and complaint, Covance argues that Lauth does not allege that Ellsworth discriminated against him on the basis of his age or that his 2011 year-end PMD, July 2012 written warning, 2012 mid-year PMD, August 2012 PIP, and termination were the result of age discrimination.  Instead, Covance contends that "the only event Lauth claims was age discrimination was his mid-year 2011 PMD."  Dkt. No. 42 at 26.  In his complaint, however, Lauth alleges that "Covance's decision to terminate [his] employment was also motivated by a discriminatory animus against [his] age, which was 60."  Compl. ¶ 36.  Lauth also alleges in this complaint that "Covance discriminated against [him] on the basis of age . . . by making threatening comments to [him] relating to his age [referring to the time Snyder asked Lauth when

individual or otherwise discriminate against any individual with respect to his compensations, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  To survive a motion for summary judgment on an ADEA discharge claim, a plaintiff must present evidence of intentional discrimination through either the direct or indirect method. *See Oest v. Ill. Dep't. of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001); *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012).  Lauth pursues his age discrimination claim under the indirect method.[9]  *See* Dkt. No. 67 at 34.

To avoid summary judgment under the indirect method, a plaintiff must offer evidence that (1) he was forty years of age or older; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) a similarly situated,

---

he was going to retire], and by giving unwarranted negative performance reviews." *Id.* ¶ 42. Although these occurrences by themselves do not amount to adverse employment actions, they "may be presented as evidence of discrimination or as evidence at the pretext stage to suggest that defendant's legitimate reasons for the plaintiff's termination are unworthy of belief or somehow tainted." *Haywood*, 323 F.3d at 532 (internal citations omitted).  In one instance though, Lauth clearly indicated in his deposition that he did not believe that his 2012 PIP was issued "in an effort to discriminate against [him] based on [his] age." *See* Dkt. 43-6 at 81.  He instead maintained that Covance issued the PIP to retaliate against him. *Id.*  The PIP, therefore, may not serve as evidence of age discrimination.  Lauth, however, has properly alleged that his termination was an act of age discrimination.

[9]  Lauth refers in his briefing to an instance in July 2011 when Snyder asked him when he was going to retire as a discriminatory and retaliatory comment.  In his briefing, however, he does not pursue his age discrimination claim under the direct method of proof; rather, he provides only the indirect method test and discusses its *prima facie* elements in arguing his position.  Snyder's comment, the only statement Lauth claims anyone at Covance made regarding his age, is not sufficient evidence of age discrimination.  "A statement of discriminatory animus must be made by a decisionmaker and relate to the action at issue." *Balderston v. Fairbanks Morse Eng. Div. of Coltec Indus.*, 328 F.3d 309, 324 (7th Cir. 2003) (finding single comment not sufficient to allow a finding of pretext) (citing *Sanghvi v. St. Catherine's Hosp., Inc.*, 258 F.3d 570, 574 (7th Cir. 2001); *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000) (holding comment must be made by decisionmaker "(1) around the time of, and (2) in reference to, the adverse employment action")).  Assuming the statement expressed discriminatory animus, Snyder was not a decisionmaker in terminating Lauth and did not make the comment in reference to Lauth's termination.  Had Lauth pursued a claim under the direct method of proof based on this comment, his claim would have failed.

substantially younger employee received more favorable treatment. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002); *see also Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 398 (7th Cir. 1997). A similarly situated employee is one whose performance, qualifications, and conduct are comparable in all material respects. *Tank v. T–Mobile USA, Inc.*, 758 F.3d 800, 809 (7th Cir. 2014). Once the plaintiff has established his *prima facie* case, the burden shifts to the employer to present a legitimate, non-discriminatory reason for the employment action. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014). On such a showing, the burden then shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination. *Id.* If a plaintiff is unable to establish a *prima facie* case of employment discrimination, an employer may not be subjected to a pretext inquiry. *Id.* (citing *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013). "In some cases, however, the issue of meeting legitimate job expectations and the question of pretext overlap. This is particularly true when the employer asserts as the nondiscriminatory reason for termination that an employee was not meeting legitimate job expectations." *Widmar*, 772 F.3d at 463 (internal citations omitted).

It is undisputed that Lauth is a member of a protected class and that his termination is an adverse employment action. He has thus satisfied the first and third elements of his *prima facie* case under the indirect method. Covance argues, however, that Lauth cannot satisfy the other elements: It denies that Lauth met its legitimate performance expectations and also argues that Lauth has not identified a similarly situated employee who was treated more favorably.

With regard to the second element of his *prima facie* case, Lauth argues that his performance was satisfactory, but acknowledges that both he and Ellsworth, a younger co-worker, "allegedly had interpersonal conflicts with other Covance employees in the kit

30

production department."[10]  Dkt. No. 67 at 34-35.  He claims, however, that Ellsworth was not held to the same performance standards and otherwise was not terminated "despite his well-established behavioral problems."  *Id.* at 35.  Because Lauth argues that Covance "applied its legitimate expectations in a disparate manner, the second and fourth prongs of [the *prima facie* test] merge, allowing the plaintiff to establish a *prima facie* case by establishing that similarly situated employees were treated more favorably."  *Grayson v O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329-30 (7th Cir. 2002)); *Curry v. Menard*, 270 F.3d 473, 478 (7th Cir. 2001); *Johnson v. West*, 218 F.3d 725, 733 (7th Cir. 2000); *Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999)).  The Court will assume for purposes of this Entry that Lauth has produced evidence sufficient to show that Covance applied its legitimate expectations in a disparate manner and, for that reason, moves to the fourth prong of the *prima facie* analysis.

The similarly situated test generally requires a plaintiff to show that the comparators had the same supervisor, were subjected to the same employment standards, and engaged in conduct similar to that of the plaintiff "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000); *see also Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011).

---

[10]  Ellsworth is also a member of the protected class, but the *prima facie* case requires only that a comparator be "substantially younger," not outside the protected class.  *Fleishman*, 698 F.3d at 609 (quoting *Franzoni*, 300 F.3d at 772).  The Seventh Circuit considers "a ten-year difference in ages . . . to be presumptively 'substantial.'"  *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997).  Ellsworth was born in 1966, and thus is substantially younger than Lauth, who was born in 1952.

Here, Ellsworth and Lauth reported to the same supervisors – first, Snyder and later, Walters – and they were both subject to the same Covance employee code of conduct and other company-wide behavior standards.  Thus, the Court's analysis focuses on whether Ellsworth engaged in conduct similar to Lauth "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Radue*, 219 F.3d at 617-18.

The Court finds that he did not.  Although there are similarities – both Lauth and Ellsworth received discipline for interpersonal communication problems – circumstances distinguish both their conduct and Covance's treatment of them.

Following the investigation into Lauth's AlertLine complaint against him, Ellsworth was placed on a 90-day PIP in January 2012.  He, however, successfully completed the PIP.  That is, in the 90-day period following his placement on the PIP, Ellsworth altered his behavior to conform to Covance's expectations.  Ellsworth again engaged in an inappropriate verbal altercation with an employee in September 2012.  He, however, took ownership of his behavior. He reported the altercation to Walters, was verbally counseled by Walters regarding the situation, and apologized to Carter.

Lauth, on the other hand, did not accept that he had communication problems, despite Covance's insistence that he did.  Instead of accepting responsibility, Lauth challenged Covance's counseling.[11]  Lauth deemed Covance's complaints regarding his poor interpersonal skills vague, saying that they did not name individuals or specific instances of problems.  He

---

[11]  Lauth even challenges the designation "counseling" as a material fact in dispute because, he asserts, it implies that he was formally disciplined.  *See, e.g.*, Dkt. No. 67 at 17; *see also* Dkt. No. 43-6 at 62 (From Lauth's deposition testimony: Lauth: "And that the statement that I was counseled was inappropriate."  Question: "But you were counseled?"  Lauth's Answer: "The topic was discussed.  It's not counseling.  It's not counseled.").

maintained this opinion despite Covance providing him on October 18, 2012, with names of several individual kit production employees who complained about specific behaviors that they found to be inappropriate, uncomfortable, or intimidating.  Lauth wanted to investigate the matter himself and also wanted Covance to investigate further by asking others about his behavior, which it did.  It reported to Lauth that these individuals also either complained of behaviors similar to those that the other employees had already complained about or understood Lauth to be engaging in such behaviors even if they had not directly experienced them themselves.  Lauth was not satisfied with this summary.  He again wanted to know specific instances of encounters, dates, and individuals' names.  Lauth believed that he communicated well with employees on many occasions, so he again refused to accept what he considered to be a generalized statement about his inability to communicate.

Lauth also did not deny or apologize for engaging in specific behaviors of which Covance disapproved.  For example, Walters specifically confronted Lauth about his personal investigation into the altercation between Ellsworth and Carter.  She told him that she believed his investigation went against the PIP.  Lauth disagreed and maintained that he was "compelled by Covance policy" to report the altercation to Grubb.  Dkt. No. 67 at 26-27.  Even if this were the case, Covance policy did not compel him to investigate the matter at all or in the manner in which he did, which involved contacting an employee who was not a witness to or a participant in the altercation.  Again, Lauth refused to accept responsibility for his actions, did not apologize for his behavior, and said that he would handle himself in the same manner, even though Covance told him that behavior was unacceptable.

This clear difference between how Ellsworth and Lauth responded to discipline or discussions regarding their behavior is what sets Ellsworth apart from Lauth.  Although

Ellsworth also had communication problems with employees, Lauth has not provided evidence that Ellsworth shared a "comparable set of failings" with him. *Faas*, 532 F.3d at 642 (internal quotations omitted). Lauth does not allege that Ellsworth exhibited Lauth's other performance deficiencies, such as his continuing lack of ownership regarding his behavior. *See, e.g.*, *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751-52 (7th Cir. 2006). While Lauth deflected blame and refused to accept Covance's recommendations regarding needed changes in behavior, Ellsworth accepted responsibility for his misbehavior and attempted to correct it. As a result, Ellsworth is not similarly situated to Lauth in this respect. *Faas*, 532 F.3d at 642-43; *Burks*, 464 F.3d at 752.

There are also differentiating circumstances that distinguish how Covance treated Ellsworth and Lauth. Ellsworth's and Lauth's job duties were different in many ways. Ellsworth's primary responsibility was system infrastructure management. He was responsible for managing software and production systems. He was a project manager, not a people manager. Lauth, on the other hand, was responsible for supervising a team of employees. His job inherently required him to be better at communicating and working with others.

Drawing all reasonable inferences in Lauth's favor, the Court finds that Lauth has not demonstrated that there is a genuine issue of triable fact as to whether similarly situated, substantially younger employees were treated differently. Lauth, therefore, has not established a *prima facie* case of age discrimination under the indirect method.

## C.     Retaliation

Lauth contends that Covance disciplined and terminated him in retaliation for making the AlertLine complaint on August 28, 2011, and filing two EEOC charges, one on January 25,

2012, and another on September 17, 2012.[12]  The ADEA prohibits retaliation by an employer where an employee "has opposed any practice made an unlawful employment practice" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a).  Like in discrimination claims, a plaintiff may establish a *prima facie* case of retaliation under the direct or indirect method.  *Argyropoulos*, 539 F.3d at 733.  Under either method, the plaintiff must present evidence that he engaged in a statutorily protected activity and suffered a materially adverse action.  *Id.*  Under the direct method, he must complete his *prima facie* case with direct or circumstantial evidence of a causal connection between his protected activity and the adverse action.  *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016).  Circumstantial evidence demonstrating retaliation may include "'suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'"  *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 307 (7th Cir. 2012) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).  Circumstantial

---

[12]  Lauth addresses in his briefs the disciplinary actions that he claims were materially adverse.  He argues that Covance retaliated against him by making certain comments in his 2011 year-end PMD; by issuing him a written warning on January 15, 2012; and by putting him on a PIP.  As the Seventh Circuit has decided, "giving [an employee] the worst performance rating she had ever received" or placing an employee on a performance improvement plan are not materially adverse.  *Langenback v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014).  To be considered a materially adverse action, "[a]t minimum, the employee must be able to show a quantitative or qualitative change in the terms or conditions of employment."  *Haywood*, 323 F.3d at 532.  Lauth does not make any such allegations related to these disciplinary actions.  Lauth's termination, however, clearly qualifies as an adverse employment action.  Accordingly, for purposes of this Entry, the Court considers Lauth's termination as the only materially adverse employment action alleged by Lauth in his retaliation claim.  As previously noted, however, actions that are not materially adverse employment actions "may be presented as evidence of discrimination [or retaliation] or as evidence at the pretext stage to suggest that defendant's legitimate reasons for the plaintiff's termination are unworthy of belief or somehow tainted."  *Id.* (internal citations omitted).

evidence, however, "must point directly to a [retaliatory] reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Lauth pursues his retaliation claim under the direct method.[13]

Lauth argues that the temporal proximity between his termination and the filing of his second charge of discrimination on September 17, 2012, suggests that the true reason for his termination was unlawful retaliation. It is well established that "mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). However, "together with other facts, [suspicious timing] can sometimes raise an inference of a causal connection." *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008). In addition to suspicious timing, Lauth relies on his similarly situated comparator and pretext arguments to evidence a causal connection. As discussed above, the Court has rejected the similarly situated comparator argument.

That leaves the Court with Lauth's pretext arguments. "To demonstrate a material issue of fact as to pretext, [a plaintiff] must show that 'either 1) it is more likely that a [retaliatory] reason motivated the employer than the proffered non-[retaliatory] reason or 2) that an employer's explanation is not credible.'" *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)). "[A] party establishes pretext with evidence that the employer's stated reason or the employment decision

---

[13] Lauth does not argue his retaliation claim under the indirect method. If he had, his claim would fail for the same reasons his age discrimination claim failed: He has not established a *prima facie* case of retaliation because he has not identified a similarly situated, non-complaining employee who was treated more favorably.

36

'was a lie—not just an error, oddity, or oversight.'" *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (quoting *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010)). "'An inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness.'" *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir.2014) (quoting *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013)).

Lauth contends that Covance solicited the complaints it received from employees after he filed his second charge of discrimination, and with respect to Wright's complaints, "manufacture[d] them . . . to supply a [pretextual] facial justification for the already-made decision to fire Lauth in retaliation for complaining about Covance's age discrimination and retaliatory conduct." Dkt. No. 67 at 33. Despite his attempt to create an issue of material fact, Lauth has offered no evidence to raise a reasonable inference that Covance did not honestly have concerns about his communications and behavior, which resulted in his termination. "'[W]hen an employer articulates a plausible, legal reason for [its action], it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for [its action].'" *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 795 (7th Cir. 2015) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 738 (7th Cir. 2011)). Covance terminated Lauth for his continued performance deficiencies in violation of the on-going obligations of his PIP. It provided him numerous examples of behaviors to support its position. For example, Walters expressed to Lauth that she believed his investigation into the incident between Ellsworth and Carter violated the PIP, an assessment about which Lauth disagreed. Covance also received, whether or not solicited, a series of complaints from employees, only some of which Lauth challenges. Lauth also does not dispute that Covance, for years, documented its

concerns regarding his communication and behavior issues, though he downplays their

significance, describing them as "constructive criticism."  *See* Dkt. No. 67 at 34.

  Lauth's situation is analogous to the plaintiff's in *Widmar*.  In *Widmar*, the plaintiff was

terminated for performance reasons after sixteen years as a plant manager.  772 F. 3d at 459.

Widmar did not believe that the problems identified by his employer were his fault.  *Id.* at 460.

Instead, he believed that his employer "falsely blamed [him] to cover up for the fact that it was

firing him because of his age."  *Id.*  Many of the performance problems identified by his

employer were, Widmar believed, simply problems with products produced in the plant, not

problems with his performance.  *Id.* at 464.  The company disagreed because, as plant manager,

Widmar was responsible for "seek[ing] out problem areas, even if they were the 'fault' of others

and fix[ing] them."  *Id.* at 464.  The Seventh Circuit found that Widmar failed to offer any

evidence of pretext, noting that "[i]n each case the result is the same.  Widmar claims he is not at

fault.  Sun Chemical expected him to be more proactive and less finger-pointing in his approach

to management."  *Id.* at 467.

  The Court finds the same result here.  When Lauth received discipline or was confronted

with a complaint regarding his actions, he provided explanations for why he believed his

performance deficiencies were justified or why his actions did not merit discipline.  Lauth

pointed fingers instead of accepting his actions.  He stated that the PIP was inappropriate because

it did not address the "root cause."  Dkt. No. 46, Ex. A-9.  He stated that if the root cause had

been investigated, there would not be a PIP against him, and that correcting him was "the wrong

approach."  *Id.*  As the Seventh Circuit has noted, "[b]eing blamed unfairly is not evidence of

deceit."  *Widmar*, 772 F.3d at 466.  While Lauth's explanations may have eliminated any cause

for concern in his eyes, it is Covance's assessment of his performance that matters.  *Balderston*

*v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 323 (7th Cir. 2003) (employee's belief regarding performance "is irrelevant to the question of pretext") (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) (finding that employee's self-interested assessment of her own job abilities is insufficient to raise an issue of fact)).  And, "'this court does not sit as a super-personnel department that reexamines an entity's business decisions.'" *Id.* at 324 (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).  To Covance, Lauth's defensive behavior was just another example of his performance failures:  He was again not taking ownership of his actions or proactively seeking to improve his interpersonal interactions.

Even in his audio recordings, Lauth provided an explanation for his PIP and Snyder's "retaliatory" treatment of him:  Lauth explained to Walters that he believed that there were two standards at Covance, one for Snyder and Ellsworth, who in Lauth's opinion were running the operation, and another for everyone else.  Dkt. No. 46 at A-9.  In his recorded conversations with Walters, he appears to have believed Ellsworth was held to a different standard because he and Snyder ran the department, not because Ellsworth was younger or had not engaged in protected activity.  In those conversations, Lauth made it clear that he felt he had been wronged since he arrived at Covance, but not because of his age or in retaliation for engaging in protected activity. Dkt. No. 46 at A-8.  Instead, he stated that he was retaliated against because he pointed out operational problems that Snyder did not want to address.  *Id.*  Lauth believed that, because he spoke up and continued to speak up on behalf of his employees, he was being retaliated against for challenging the way Snyder and Ellsworth ran things.  *Id.*  This does not violate the ADEA. Accordingly, no reasonable jury could conclude that Covance's reasons for Lauth's termination were a pretext for retaliation.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Covance's motion for summary judgment (Dkt. No. 41) is

**GRANTED** in its entirety.  Lauth's motion to file surreply in opposition to Covance's motion

for summary judgment (Dkt. No. 81) is also **GRANTED**.  Lauth's motion for leave to file reply

in support of that motion (Dkt. No. 84) is **DENIED AS MOOT**.

SO ORDERED: 6/14/16

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification.

40